**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **ATLAS IP, LLC**, | ) |
| a Florida Limited Liability Corporation, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 15 C 10746 |
| | ) |
| **EXELON CORP.**, et al., | ) |
| | ) |
| Defendants. | ) |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Atlas IP, LLC ("Atlas") brought this action alleging that Exelon Corp. ("Exelon") and Commonwealth Edison Co. ("ComEd") infringed U.S. Patent No. 5,371,734 ("Patent '734"), entitled "Medium Access Control Protocol For Wireless Network." Exelon has since been dismissed as a defendant. Now before this Court for decision is ComEd's motion under Fed. R. Civ. P. ("Rule") 12(b)(6) to dismiss Atlas' Second Amended Complaint ("SAC") for failure to state a claim on which relief can be granted. For the reasons explained in this opinion, not only the SAC but this action itself must be and are dismissed.

**<u>Motion To Dismiss Standards</u>**

Under Rule 12(b)(6) a party may move for dismissal for the "failure to state a claim upon which relief can be granted." In patent cases, the standards applicable to motions under Rule 12(b)(6) are those articulated by the regional Court of Appeals rather than any uniform standard set by the Federal Circuit (see <u>R+L Carriers, Inc. v. DriverTech LLC</u> (<u>In re Bill of Lading Transmission & Processing Sys. Patent Litig.</u>), 681 F.3d 1323, 1331 (Fed. Cir. 2013)). Here familiar Rule 12(b)(6) principles taught by our Court of Appeals require the district court to accept as true all of Atlas' well-pleaded factual allegations and to view them in the light most

favorable to it as the non-moving party (<u>Lavalais v. Vill. of Melrose Park</u>, 734 F.3d 629, 632 (7th Cir. 2013)). But "legal conclusions or conclusory allegations that merely recite a claim's elements" are not entitled to any presumption of truth (<u>Munson v. Gaetz</u>, 673 F.3d 630, 632 (7th Cir. 2012)).

In the past decade the Supreme Court made an important change in the evaluation of Rule 12(b)(6) motions via what this Court regularly refers to as the "<u>Twombly</u>-<u>Iqbal</u> canon," a usage drawn from <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544 (2007), as more finely tuned in <u>Erickson v. Pardus</u>, 551 U.S. 89 (2007) (per curiam), and <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009)). That canon has introduced the concept of "plausibility" into the analysis, and in that respect our Court of Appeals has "interpreted <u>Twombly</u> and <u>Iqbal</u> to require the plaintiff to provid[e] some specific facts to support the legal claims asserted in the complaint" (<u>McCauley v. City of Chicago</u>, 671 F.3d 611, 616 (7th Cir. 2011) (internal quotation marks omitted)). As <u>McCauley</u> went on to reconfirm, claimants "must give enough details about the subject-matter of the case to present a story that holds together" (<u>id.</u>). Allegations that are merely consistent with (rather than suggestive of) an entitlement to relief, especially in the face of an obvious alternative explanation, fail that test (<u>id.</u>).

Because the focus of Rule 12(b)(6) motions is on the pleadings, they "can be based only on the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice" (<u>Geinosky v. City of Chicago</u>, 675 F.3d 743, 745-46 n.1 (7th Cir. 2012)). But a nonmovant has more flexibility, for it "may elaborate on [its] factual allegations so long as the new elaborations are consistent with the pleadings" (<u>id.</u>).

In granting a dismissal courts should usually give a claimant at least one opportunity to amend (Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Ind., 786 F.3d 510, 519 (7th Cir. 2015)). And consistently with the principles of Rule 15(a)(2), courts generally grant leave to amend freely. But where "it is certain . . . that any amendment would be futile or otherwise unwarranted," the court can deny leave to amend (id. at 519-20, emphasis in original).

## Background

Filed in January 1993, Patent '734 describes a medium access control ("MAC") protocol for a wireless network that (1) permits multiple stations to communicate over the network without interfering with each other and (2) conserves the battery life of those stations (Patent '734 at col. 5 ll. 9-33).[1] In outline, the first goal is accomplished by having the stations take turns, with a central hub assigning each remote station an interval of time in which it will be allowed to transmit frames of data over the wireless medium (id. at col. 5 ll. 42-54). That time-sharing arrangement permits the remote stations to conserve their batteries by powering down their transmitters when it is not their turn to transmit and their receivers when it is not the hub's turn to transmit (id. at col. 5 ll. 55-65).

Several MAC protocols exist that function in roughly the same manner (see id. at col. 2 l. 63 - col. 4 l. 22; St. Jude Med., Inc. v. Atlas IP, LLC, No. IPR2014-00916 at 13-15, 25-26 (P.T.A.B. Dec. 3, 2015)). Patent '734 represents one variation on that theme.

---

[1] This opinion refers to the parties' memoranda as "Mem. --" or "Reply --" as appropriate, with identifying prefixes of "A." for Atlas and "C." for ComEd. Patent '734 is cited by column and line, and the Second Amended Complaint is cited as "SAC ¶ --." Citations to the table provided in SAC Ex. B are to the third column of the row indicated, with that row identified by the part of Claim 1 that it addresses. In that context "elem. --" refers to the element number and "pmbl." to the preamble.

- 3 -

This action involves that patent's Claim 1, which reads in full (Patent '734 at col. 44 l. 63 - col. 45 l. 40):

A communicator for wirelessly transmitting frames to and receiving frames from a [sic] least one additional communicator in accordance with a predetermined medium access control protocol, the communicators which transmit and receive the frames constituting a Group, each communicator including a transmitter and a receiver for transmitting and receiving the frames respectively, the medium access control protocol controlling each communicator of the Group to effect predetermined functions comprising:
    designating one of the communicators of the Group as a hub and the
        remaining the [sic] communicators of the Group as remotes;
    the hub establishing repeating communication cycles, each communication
        cycle having intervals during which the hub and the remotes transmit and
        receive frames;
    the hub transmitting cycle establishing information to the remotes to establish
        the communication cycle and the plurality of predeterminable intervals
        during each communication cycle, the intervals being ones when the hub
        is allowed to transmit frames to the remotes, when the remotes are allowed
        to transmit frames to the hub, and when each remote is expected to receive
        a frame from the hub;
    the hub transmitting a frame containing the cycle establishing information
        which establishes both an outbound portion of the communication cycle
        when the hub transmits frames to the remotes and an inbound portion of
        the communication cycle when the remotes transmit frames to the hub, the
        frame containing the cycle establishing information also establishing the
        predetermined intervals during the outbound and inbound portions of the
        communication cycle when each remote is allowed to transmit and
        receive;
    the remotes powering off their transmitters during times other than those
        intervals when the remote is allowed to transmit frames to the hub, by
        using the cycle establishing information transmitted from the hub; and
    the remotes powering off their receivers during times other than those
        intervals when the remote is expected to receive a frame from the hub, by
        using the cycle establishing information transmitted from the hub.

For ease of exposition, this opinion will refer to the second element (id. at col. 45 ll. 8-11) as the "Repeating Cycle Element," the fourth (id. at col. 45 ll. 20-30) as the "Frame Element" and to the sixth (id. at col. 45 ll. 36-40) as the "Power Element."[2]

Before Patent '734 expired in January 2013, ComEd installed Smart Meters to enable it to monitor customers' natural gas and electricity usage (SAC ¶¶ 6, 10). Those Smart Meters communicate with an Access Point (collectively "Network Products") wirelessly over the 902-928 MHz band to form neighborhood area networks (SAC ¶¶ 6-8). There is a definite hierarchy to those communications, with the Access Point acting as the base and the Smart Meters operating as remotes (SAC ¶ 11). While the SAC alleges that the Network Products are arranged in groups containing "at least one" Smart Meter (SAC ¶ 11), Atlas' Mem. at 5 asserts -- with how much forethought this Court cannot tell -- that "there is only one" Smart Meter in each neighborhood area network.

Communication sessions are initiated by the Access Point, which transmits at least one frame of data that allows the Smart Meter to calculate the duration of the session and the time interval during which the Smart Meter may transmit its information to the Access Point (SAC ¶ 12). More particularly, the Access Point communicates the starting time of each communication cycle by transmitting a request for a meter reading or to check the Smart Meter's status, with that request alerting the Smart Meter that the cycle is starting (SAC Ex. B at elem. 3). And because both the requests and the responses to those requests are fixed in length,

_____

[2] While the fifth element (Patent '734 at col. 45 ll. 31-35) also describes the remotes' battery conservation features and so could accurately be called a "Power Element" as well, the parties dispute only what the SAC alleges as to the Smart Meters' receiver circuitry.

transmission of the request alone suffices to inform the Smart Meter of the duration of the intervals respectively allocated to the Access Point for transmission and to the Smart Meter (id.).

With information about the communication cycle thus available to it, the Smart Meter (as it uses a half-duplex radio transceiver) powers down its transmitter circuitry while it is receiving requests from the Access Point (SAC Ex. B at elem. 5). Similarly, the Smart Meter powers down its transceiver's receiver circuitry while it is transmitting its responses (SAC Ex. B at elem. 6).

This Court earlier issued a minute order (Dkt. No. 15) granting defendants' motion (1) to dismiss Atlas' initial Complaint as to Exelon with prejudice and (2) to amend its allegations as to ComEd's alleged infringement. Atlas then filed an Amended Complaint, which it withdrew in the face of ComEd's renewed motion to dismiss (Dkt. Nos. 19, 21, 24). Atlas then filed the SAC on March 24 (Dkt. No. 25), and the instant motion then followed (Dkt. No. 28).

### Sufficiency of Atlas' Second Amended Complaint

As Pac. Coast Marine Windshields, Ltd. v. Malibu Boats, LLC, 739 F.3d 694, 700 (Fed. Cir. 2014) has recently reconfirmed:

> Utility patents may be infringed both literally and under the doctrine of equivalents.

And as Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1575 (Fed. Cir. 1995) has taught as to the first of those alternatives, "[t]o establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly." Similarly, the doctrine of equivalents will support an infringement claim only if "the accused device contains an equivalent for each limitation not literally satisfied" (Wi-LAN, Inc. v. Apple Inc., 811 F.3d 455, 463 (Fed. Cir. 2016)). Such equivalency requires that any differences between the disclosed product

and the allegedly infringing product be "insubstantial," which ordinarily requires that "the accused device perform[ ] substantially the same function in substantially the same way to obtain substantially the same result" (see <u>Virnetx, Inc. v. Cisco Sys., Inc.</u>, 767 F.3d 1308, 1322 (Fed. Cir. 2014)).

Moreover, where a patent claim is not phrased in terms of capability, a product's being "reasonably capable" of an infringing configuration does not of itself infringe the patent (<u>Ball Aerosol & Specialty Container, Inc. v. Limited Brands, Inc.</u>, 555 F.3d 984, 994-95 (Fed. Cir. 2009). Instead infringement in that case "requires specific instances of direct infringement or that the accused device necessarily infringes the patent in suit" (<u>id.</u> at 995, internal quotation marks omitted).

Except when the patentee has expressly defined a term or has clearly and unmistakably disavowed any intent to patent a particular feature, the plain meaning of a claim's language controls its construction (<u>Luminara Worldwide, LLC v. Liown Elecs. Co.</u>, 814 F.3d 1343, 1353 (Fed. Cir. 2016)). In that respect the claim language is normally given the ordinary and customary meaning that the words in which it is cast would have to a person of ordinary skill in the relevant art at the time of invention (see <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005)) -- and that meaning can be gleaned from "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art" (<u>id.</u> at 1314). On that score <u>Trs. of Columbia Univ. v. Symantec Corp</u>, 811 F.3d 1359, 1362 (Fed. Cir. 2016) (internal quotation marks and citation omitted) teaches that "[t]he specification is the single best guide to the meaning of a disputed term, and is, thus, the primary basis for construing the claims."

- 7 -

Claim construction "may be based on underlying findings of fact" (Wi-LAN, 811 F.3d at 461), but as recently reiterated by Trs. of Columbia Univ., 811 F.3d at 1362, "[c]laim construction is ultimately a question of law," and determinations grounded solely on the claim language, the specification and the prosecution history (as opposed to the extrinsic record) are purely legal in nature. Atlas is therefore entirely incorrect in stating that claim construction cannot be engaged in at all at the motion to dismiss stage, at least when it is based on facts alleged in or reasonably inferable from the complaint.

ComEd argues that the SAC, which now includes a table asserting how the Network Products allegedly practice each of Claim 1's limitations (see SAC Ex. B), still fails to state facts as to the Frame and Power Elements that would entitle it to relief. Because the Federal Circuit has quite recently reiterated that a complaint does not have to "describe precisely how each element of the asserted claims are being practiced" or "even identify which claims it asserts are being infringed" (R+L Carriers, 681 F.3d at 1335, citing McZeal v. Sprint Nextel Corp., 501 F.3d 1354, 1356-57 (Fed. Cir. 2007)); see also K-Tech Telecomm., Inc. v. Time Warner Cable, Inc., 714 F.3d 1277, 1283-87 (Fed. Cir. 2013)), this opinion now turns to why ComEd's objection is to be taken seriously.

And that reason is straightforward: Far more recently than the Federal Circuit's issuance of those opinions, the Rules have been amended effective December 1, 2015 to abrogate both Rule 84 and the Appendix of Forms that Rule 84 had identified as sufficient, and K-Tech, 714 F.3d at 1283-87, R+L Carriers, 681 at 1334-35 and McZeal, 501 at 1356-57 were all dependent on the skeletal paradigm provided by Form 18 (or Form 16 when McZeal was decided). Both K-Tech, 714 F.3d at 1283-84 and R+L Carriers, 681 at 1335 n.7 came to that formalistic conclusion despite intimating that the sufficiency of Form 18 under the Twombly-Iqbal standard

could well be criticized -- indeed, just such criticisms were voiced by dissenting opinions in both R+L Carriers, 681 F.3d at 1347-55 (Newman, Cir. J., dissenting in part) and McZeal, 501 F.3d at 1359, 1360-61 (Dyk, Cir. J., dissenting in part).

That being so, there is no longer an immovable object blocking the path of the Twombly-Iqbal canon's unstoppable force. Hence this Court's task is simply to apply that canon according to the standards articulated by our Court of Appeals (see R+L Carriers, 681 F.3d at 1331). In that vein, factual allegations that do not permit a court to infer that the accused product infringes each element of at least one claim are not suggestive of infringement -- they are merely compatible with infringement. Because the failure to practice even a single element is all that separates innovation from infringement (see Wi-LAN, 811 F.3d at 463; Southwall Techs., 54 F.3d at 1575), there is always an obvious alternative explanation where a plaintiff does not allege facts about each element (although the format that those allegations take must depend on the complexity of the patent and the number of claims allegedly infringed). Indeed, given the investigation that Rule 11(b) requires before filing a complaint, it is difficult to imagine how an action for infringement could be brought without a tentative but nonetheless coherent theory of which claims are allegedly infringed and how the accused products practice -- or, because Rule 11(b)(3) permits pleading on information and belief, may practice -- each of those claims' elements.

In terms of the matter at hand, ComEd objects that the SAC fails to allege, as the Frame Element requires (see Patent '734 at col. 45 ll. 27-30), that the frame containing the information that establishes the communication cycle also includes information "establishing the predetermined intervals during the outbound and inbound portions of the communication cycle when each remote is allowed to transmit and receive." That is, the SAC alleges that the frame

establishes when it is the Access Point's turn to transmit and when it is the turn of the Smart Meters as a group, but it does not allege that the frame also allocates time among multiple Smart Meters on the neighborhood area network.

ComEd also contends that the SAC's allegations about when the Smart Meters power down their receiver circuitry does not parallel the Power Element in two crucial respects. First, the SAC describes when those circuits are powered down but not the information that the Smart Meters use in determining when to shut them down, while the Power Element requires that it be done "using cycle establishing information transmitted from the hub" (see Patent '734 at col. 45 ll. 38-40). Second, the SAC alleges that power is cut to the receivers when the Smart Meter is transmitting, but the Power Element specifies that receivers are powered down at all times other than when a remote is expected to receive a frame from the hub.

Atlas responds that, in cases where the neighborhood area network has only an Access Point and one Smart Meter, the Network Products function as described in Claim 1. In that configuration, it asserts, there is no need to subdivide the portion of the communication cycle allocated for the remotes among several remotes -- in that situation, by definition a communication that tells when a group as a whole may transmit will necessarily tell a "group" of one when it may transmit -- and so the Frame Element is practiced. Similarly, because the only other communicator that might transmit when only one remote is present is the hub, a Smart Meter's powering down its receiver whenever it is transmitting would power it down whenever it is not expecting to receive a frame from the Access Point. And because the power status of a Smart Meter's receiver thus depends on when it last received a request from the Access Point, that status is set by using information transmitted by the Access Point, Atlas argues.

- 10 -

Thus Atlas impliedly concedes that the Network Products would not function as Claim 1 describes when two or more Smart Meters are networked with a single Access Point, for in that case the bare fact that the Access Point queries a single Smart Meter would not convey any information at all about transmission opportunities allocated to the other Smart Meters. Moreover, the transceiver would not power down its receiver circuitry when other Smart Meters had a transmission opportunity -- that is, at all times other than when a frame from the Access Point is to be expected.

Atlas' claim for relief therefore rests on not one but three untenable positions. First, it requires that Claim 1 reach a MAC protocol incapable of controlling two or more remotes. Second, it neglects the fact that its explanation of how the Network Products allegedly practice the Frame and Power Elements means that they almost certainly do not practice the Repeating Cycle Element. And third, the SAC makes it clear that the Network Products are not controlled by a MAC protocol incapable of controlling two Smart Meters. In short, Atlas has brought a hopeless lawsuit of precisely the sort that the last decade's interpretation of and amendments to the Rules were intended to dispose of quickly and even to deter outright.[3]

**<u>Controlling Multiple Remotes in a Communication Group</u>**

Atlas argues that the rudimentary exchange of application-specific information that it alleges occurs between an Access Point and a Smart Meter infringes Claim 1 when there is only one Smart Meter in the communication group. That requires viewing that substantive exchange as a MAC protocol. And because medium access rights are not allocated among multiple Smart

_____

[3] Other aspects of the SAC beyond those discussed in this opinion are more than troubling, but enumerating them would unduly distract from the analysis that prompts this Court to dismiss the SAC and this action.

Meters, Atlas' argument requires viewing that exchange as a MAC protocol incapable of controlling more than one remote. But no one ordinarily skilled in wireless networking technology would understand Claim 1 to cover a MAC protocol that cannot control multiple remotes.

At a very basic level, Claim 1 describes the MAC protocol in accordance with which each communicator transmits and receives frames as controlling access to the medium among a plurality of "remotes" (see Patent '734 col. 45 ll. 7, 10, 13, 17, 23, 25, 31, 36) and as providing the necessary cycle establishing information to "each remote" (see id. at col. 45 ll. 18, 29). At no point is any element of Claim 1 phrased in a manner that would encompass the (bizarre) possibility that the MAC protocol described might be incapable of doing so for more than a single remote.

Importantly, the Frame Element makes sense only if any MAC protocol covered by Claim 1 must be capable of controlling a plurality of remotes. That element requires that the hub transmit cycle-establishing information with two components, without exception. That information must allocate time between the hub and "the remotes" (Patent '734 col. 45 ll. 21-25). It must also identify for "each remote" its allocation of the hub's time when it is expected to receive a transmission and its allocation of the remotes' time when it is permitted to send a transmission (id. at col. 45 ll. 25-30). Neither part of that cycle-establishing information can be dispensed with (see id. at col. 45 ll. 20-30). Neither part is stated conditionally, as though dependent on whether an engineer wanted a communicator's MAC protocol to be capable of handling multiple remotes. At any particular time the cycle-establishing information may happen to comprise two redundant pieces, such as when a consumer decides to network only one remote to a hub, but it must have both pieces. Atlas' position that the second piece of

- 12 -

information might be <u>necessarily</u> redundant and so dispensed with entirely cannot be reconciled with the language chosen by the patentee, which consistently maintains a distinction between two necessary pieces of information.

Nothing in the specification suggests an alternate reading of that claim language. On the contrary, the MAC protocol described must be "equally applicable" to service as both a self-contained wireless network and as a bridge between single-node and multiple-node local area network ("LAN") segments, "so that all the nodes . . . can achieve effective LAN like communication among a 'Group' of separate LAN segments" (Patent '734 col. 8 l. 65 - col. 9 l. 32). And the patented MAC protocol is distinguished from previous MAC techniques in its bare ability to handle multiple remotes broadcasting over the same busy wireless medium (see <u>id.</u> at col. 3 ll. 11-25) or (where the prior art also had a hub that assigns transmission opportunities to multiple competing remotes) in its reduced overhead and battery usage in handling multiple remotes (see <u>id.</u> at col. 3 ll. 37-56, col. 4 ll. 8-22, col. 4 l. 56 - col. 5 l. 3, col. 5 ll. 9-33). That observation also suffices to dispel any notion that a MAC protocol incapable of addressing the problem of interference among multiple remotes is at all equivalent, let alone substantially equivalent, to one designed precisely to do so.

In an effort to escape the obvious significance of Claim 1's speaking in terms of a plurality of remotes, Atlas points to the fact that the invention claimed is (Patent '734 col. 44 ll. 63-66) (emphasis added):

> A communicator for wirelessly transmitting frames to and receiving frames from <u>at least one</u> additional communicator in accordance with a predetermined medium access control protocol . . . .

And of course everybody knows that "at least one" can include just one.

- 13 -

But Atlas' argument confounds a description of the communicator's capabilities with that of the MAC protocol's capabilities. Each communicator must be capable of exchanging frames with at least one additional communicator, but the MAC protocol according to which they do so must satisfy the elements that follow the phrase (Patent '734 col. 45 ll. 2-3):

> the medium access control protocol controlling each communicator of the Group to effect predetermined functions comprising: . . .

Hence a communicator incapable of communicating at all does not of course practice Claim 1, but neither does a communicator that utilizes a different MAC protocol or no formal MAC protocol at all. Any MAC protocol in accordance with which an infringing communicator transmits and receives must be capable of controlling access to the medium among "remotes" (see Patent '734 col. 45 ll. 7, 10, 13, 17, 23, 25, 31, 36) and provide the necessary cycle establishing information to "each remote" (see id. at col. 45 ll. 18, 29).

Atlas' action thus depends on a claim construction that is wrong as a matter of law. Hence any amendment would be futile.

**Repeating Cycle Limitation**

At the risk of superfluity, this opinion notes that Atlas' action is not sunk by claim construction alone. Indeed, Atlas' purported explanation will not withstand scrutiny even in terms of its suggested lonesome network configuration. After all, if the only way a Smart Meter "knows" the intervals allocated to it and to the Access Point is the foreseeability of how long it will take for it to respond, the Access Point's bare transmission of an occasional query does not "establish[ ] repeating communication cycles" (see Patent '734 at col. 45 l. 8, emphasis added), as is required by the Repeating Cycle Element. Tellingly, the otherwise detailed table attached to the SAC says nothing about how the Access Point supposedly establishes a repeating cycle (see

- 14 -

SAC Ex. B. at elem. 2). And aside from the fact that the specification clarifies that a repeating cycle "is repeated <u>on a continuous basis</u> as long as the hub is active" (Patent '734 at col. 11 ll. 41-42, emphasis added), any delay between (1) the conclusion of a Smart Meter's response and (2) the next query from the Access Point would constitute an interval during which access to the medium would be uncontrolled.

Clearly a failure to control access to the medium at all cannot be presented as producing substantially the same result in substantially the same way as a medium access control protocol, let alone the one delimited by Claim 1. Atlas neither alleges that Smart Meters are prevented from broadcasting in the 902-928 MHz band during any such interval nor says what the power status of their transmitter and receiver circuits would be.

Nor does Atlas say that there are no such intervals. Its general allegation that "[t]he access point establishes communication cycles with the smart meter that repeats [sic]" (SAC ¶ 16) does not provide the crucial information of when the cycle repeats. Such an omission would not ordinarily be a problem on a motion to dismiss, but Atlas' detailed description of how the Network Products function indicates that later signals from the Access Point do not satisfy any reasonable construction of the Repeating Cycle Element and so undercuts any inference that might be drawn in Atlas' favor from that general allegation. In sum, in light of the SAC as a whole, ComEd's alleged infringement of that element either literally or under the doctrine of equivalents is entirely speculative.

**<u>Actual Configuration of the Network Products</u>**

Even apart from Atlas' (1) indefensible claim construction and (2) the fact that its description of how the Network Products supposedly practice the Frame and Power Elements means that they almost certainly do not practice the Repeating Cycle Element, that description of

the Network Products is actually undercut by the SAC itself.  And that provides a third sufficient reason to dump the SAC.

Because its account of how the Network Products supposedly infringe depends on their conforming to a MAC protocol incapable of controlling more than one remote, Atlas' case hinges on each neighborhood area network's being necessarily limited in all instances to just one Smart Meter.  But SAC ¶ 11 is clear that each neighborhood area network contains "at least one" Smart Meter, that is, that there is no such necessary limitation.  So Atlas must contradict the SAC to get anywhere at all.

In that respect, this Court must reject Atlas' late assertion that "there is only one" Smart Meter networked with each Access Point in a communication group (A. Mem. 5).  Plaintiffs may augment the allegations of the complaint in opposing a motion to dismiss, but they cannot contradict it (Geinosky, 675 F.3d at 745 n.1).

**One Final Problem**

This is now Atlas' third attempt to describe the Network Products in terms of its own patent.  Litigants get one free bite at the amendment apple under Rule 15(a)(1), but Rule 15(a)(2) does not permit a plaintiff to alter the factual basis of its suit in response to an explanation of why its suit lacks merit (rather than on the basis of new evidence).  Patent '734 speaks of multiple remotes, and all three complaints to this point have spoken of multiple Smart Meters. Atlas was certainly familiar with its own patent and what an infringing product would look like when it filed this lawsuit.  And so leave to amend is denied for the additional reason that no amendment can permissibly contradict the facts on which Atlas has repeatedly grounded its claim for relief, rather than clarify or supplement them.

- 16 -

## **<u>Conclusion</u>**

Atlas' action depends on an unsustainable construction of the allegedly infringed patent claim. Moreover, the facts recited in its memorandum opposing the present motion as to how the Smart Meters and Access Points function do not permit a reasonable inference of infringement even on its own construction of that claim and are contradicted by its own Second Amended Complaint. Consequently ComEd's motion (Dkt. No. 28) is granted, and both the Second Amended Complaint and this action are dismissed.

_____
Milton I. Shadur
Senior United States District Judge

Date: May 17, 2016

- 17 -