IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **ATLAS IP, LLC**, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 15 C 10746 |
| | ) |
| **EXELON CORP.**, et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

On May 17, 2016 this Court issued a memorandum opinion and order ("May 17 Opinion") granting judgment in favor of Commonwealth Edison Co. ("ComEd"), the sole remaining defendant in this patent infringement action brought by Atlas IP, LLC ("Atlas"). Now ComEd asks that this Court award it attorneys' fees and costs under 35 U.S.C. § 285 ("Section 285") and to hold Atlas' attorneys' law firm Stadheim & Grear, Ltd. ("Stadheim & Grear") jointly and severally liable under 28 U.S.C. § 1927 ("Section 1927").

## Standard of Review

Section 285 modifies the "American Rule" in patent cases, providing that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." As Octane Fitness, LLC v. Icon Health & Fitness, Inc., 134 S. Ct. 1749, 1756 (2014) has explained:

> We hold, then, that an "exceptional" case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated. District courts may determine whether a case is "exceptional" in the case-by-case exercise of their discretion, considering the totality of the circumstances.

Moreover, "sanctionable conduct is not the appropriate benchmark" for determining that a party has litigated in an unusually unreasonable manner (id.).

By contrast, Section 1927 does require sanctionable conduct. It provides district courts with the discretion to hold an attorney liable for the attorneys' fees and expenses of the opposing party if that attorney "multiplies the proceedings in any case unreasonably and vexatiously." For Section 1927 purposes an attorney multiplies proceedings "vexatiously" if he or she acts with either subjective or objective bad faith (Dal Pozzo v. Basic Mach. Co., 463 F.3d 609, 614 (7th Cir. 2006)) -- or, of course, with both. Importantly, only attorneys and other persons admitted to conduct cases can be held liable under the statute, not their law firms (Claiborne v. Wisdom, 414 F.3d 715, 723 (7th Cir. 2005)).

Objective bad faith need not be predicated on a finding of malice or ill will -- instead reckless indifference to the law will suffice (Dal Pozzo, 460 F.3d at 614). And as Dal Pozzo, id. (internal quotation marks and citation omitted) teaches, that standard is met by "pursu[ing] a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound." Alternatively, if an objectively colorable basis for an attorneys' conduct does exist, his or her actions can still be considered vexatious and unreasonable through a showing of subjective bad faith (id.). More particularly, Section 1927 requires attorneys to dismiss claims that are no longer viable (Jolly Group, Ltd. v. Medline Indus., Inc., 435 F.3d 717, 720 (7th Cir. 2006)).

**<u>Background</u>**[1]

On November 30, 2015 Atlas filed a Complaint alleging that Exelon Corp. ("Exelon") and ComEd had violated U.S. Patent No. 5,371,734 ("Patent '734") (Complaint ¶¶ 7, 12, 26).[2] That Complaint and all later papers that Atlas filed were signed by George C. Summerfield ("Summerfield"). Atlas had acquired Patent '734 by assignment -- whether before or after it expired in January 2013 is unclear -- and only a predecessor in interest ever made or sold any products covered by it (Complaint ¶¶ 2, 28).

Patent '734 col. 5 ll. 9-33 discloses a medium access control ("MAC") protocol for a wireless network that (1) permits multiple stations to communicate over the network without interfering with each other and (2) conserves the battery life of those stations. Claim 1 of that patent, which Atlas identified as representative (Complaint ¶ 4), specifies that one device in a communication group will be designated as a hub, with the remainder being remotes (col. 45 ll. 5-7). That hub then establishes a communication cycle and informs the remotes of the intervals of time in that cycle when it is the hub's turn to transmit, when it is the remotes' turn to transmit, and when each remote should expect to receive a transmission from the hub (col. 45

---

[1] This opinion cites to the parties' memoranda on the current motion as "Mem." or "Reply" as appropriate, with identifying prefixes of "C." for ComEd and "A." for Atlas. Patent '734 is simply cited by column and line without any need to include the prefatory "Patent '734"), while the Complaint (Dkt. No. 1) is cited as "Complaint ¶ --," the Amended Complaint (Dkt. No. 19) as "FAC ¶ --" and the Second Amended Complaint (Dkt. No. 25) as "SAC ¶ --." Citations to the table provided in SAC Ex. B are to the third column of the row indicated, with that row identified by the part of Claim 1 that it addresses. In that context "elem. --" refers to the element number. Atlas' memorandum in response to ComEd's motion to dismiss the SAC (Dkt. No. 29) is referred to as the "Dismissal Memorandum" and is cited "Dis. Mem. --." Unless otherwise noted, all dates refer to the year 2016.

[2] Because Atlas' conduct in this litigation -- including its shifting allegations -- is at issue on the present motion, this Court will cite to superseded pleadings where appropriate for the narrative.

ll. 12-19). Claim 1's Frame Element (col. 45 ll. 20-30) further specifies that such information is to be transmitted in a frame of data that contains (1) the transmission opportunities allocated to the hub and to the remotes as a group and (2) a statement as to when each remote individually is allowed to transmit and receive. Per the Power Element (col. 45 ll. 36-40), each remote is to use that information to power down its radio receiver whenever it is not expected to receive a transmission from the hub. And the Repeating Cycle Element (col. 45 ll. 8-11) provides that those communication cycles are to repeat, which the specification (col. 11 ll. 41-42) clarifies to mean repetition "on a continuous basis as long as the hub is active."

Atlas' Complaint alleged that ComEd violated Patent '734 by installing Smart Meters to enable it to monitor customers' natural gas and electricity usage (Complaint ¶¶ 7) and that Exelon did so as the holding company of various utilities (including ComEd) that installed such Smart Meters (Complaint ¶8). Those Smart Meters communicate with an Access Point (collectively "Network Products") wirelessly over the 902-928 MHz band to form neighborhood area networks (Complaint ¶¶ 7-10).

Complaint ¶ 13, in language that would be repeated verbatim in both the Amended and Second Amended Complaints (respectively "FAC" and "SAC"), stated:

> The Accused Products form a group of at least one device operating in remote mode (smart meter), and one device operating in base mode (access point).

As to the Frame Element, Complaint ¶ 14 alleged:

> The access point transmits at least one frame of data to a smart meter that initiates a communication session, and which allows the smart meter to calculate the duration of the communication session and its constituent intervals before the smart meter transmits to the access point during the communication session.

During that session the Access Point and Smart Meter transmit frames to one another, potentially consisting of an interrogation message, utility usage, machine state data or an acknowledgement

- 4 -

(Complaint ¶¶ 15-17). When a Smart Meter is not transmitting data, it "has the ability" to power off its transmitter, and similarly it "has the ability" to shut down power to its receiver when it is not receiving data (Complaint ¶¶ 19-20). But if a Smart Meter has powered down its receiver, it restores power to it once it finishes transmitting (Complaint ¶ 21). Such communications sessions repeat somewhere on the order of every hour (Complaint ¶ 18).

One day after Atlas filed this action, Fed. R. Civ. P. ("Rule") 84 was abrogated, along with the Appendix of Forms that Rule had declared sufficient. And two days after that St. Jude Med., Inc. v. Atlas IP, LLC, IPR2014-00916 (P.T.A.B. Dec. 3, 2015) invalidated Claims 6, 11, 14 and 21 of Patent '734 (the "Invalidated Claims"). It found that a combination of three patents either directly anticipated each of those claims or, in combination, rendered the alleged invention obvious. Each of the Invalidated Claims augmented Claim 1, with only the Frame Element being unique to Claim 1 (compare col. 44 l. 63 - col. 45 l. 40 with col. 46 ll. 16-57, col. 47 l. 62 - col. 48 l. 36, col. 49 ll. 31-68 and col. 50 l. 39 - col. 51 l. 9).

And so Daralyn Durie ("Durie") -- an attorney whose law firm represented Exelon, ComEd and another utility sued by Atlas on the same patent in the Northern District of California -- wrote to Summerfield on January 6 and demanded that Atlas drop both actions ("Durie's letter," C. Mem. Ex. 2). Durie's letter represented that the Smart Meters never cut power to their receivers using information transmitted by the Access Point, as required by all of Patent '734's claims (id. at 1). Instead Smart Meters either never power off their receivers at all (if they are attached to the electric grid) or power them off based on a schedule set by the manufacturer or field technicians (id.). As a second ground for the voluntary dismissal of both actions, Durie's letter asserted that St. Jude Med. and a related case that had provided it with a binding claim construction, Atlas IP, LLC v. Medtronic, Inc., 809 F.3d 599 (Fed. Cir. 2015),

spelled certain doom for the remaining claims of Patent '734 and thus that Atlas had no good-faith basis for alleging that any valid claim had been infringed (id. at 1-2).

Two days later Summerfield responded by e-mail ("Summerfield's e-mail," C. Mem. Ex. 3 at 1). He asserted that the Smart Meters do in fact power off their receivers based on information communicated by the hub because that is what is prescribed by the IEEE 802.15.4g communication protocol that they employ (id. at 1). In addition he argued that St. Jude Med. had not invalidated Claim 1 and that the Frame Element served to distinguish it from both the Invalidated Claims and the prior art that had led to their invalidation (id.). In making that argument, Summerfield pointed to the language (id., quoting col. 45 ll. 25-30 (emphasis in C. Mem. Ex. 3)):

> the frame containing the cycle establishing information also establishing the predetermined intervals during the outbound and inbound portions of the communication cycle **when each remote is allowed to transmit and receive**.

In any event he announced that Atlas intended to appeal St. Jude Med. if its request for reconsideration was denied (C. Mem. Ex. 3 at 1).

Durie then asked Summerfield which section of the IEEE 802.15.4g standard mandated that the devices power off their receivers in that manner ("Durie's follow-up e-mail," C. Mem. Ex. 3 at 1). ComEd claims that it received no response (C. Mem. 5).

This Court granted defendants' motion to dismiss the Complaint in a minute order at that motion's presentment hearing on February 15 (Dkt. No. 15). And Exelon was dismissed from the case entirely, as the only asserted basis for its liability had been that it was ComEd's parent company (id.).

In response Atlas filed the FAC on February 26.  Aside from dropping the allegations about Exelon, that pleading was largely identical with the one it superseded, and its minimal alterations in other respects play no role in the story.

ComEd again moved to dismiss Atlas' pleading for failure to state a claim.  And when that motion's presentment hearing arrived, Atlas again did not defend it but instead requested (and was granted) leave to file an additional amendment (Dkt. No. 24).

So Atlas filed the SAC on March 24.  But the SAC undid all of the changes the FAC had made to the Complaint other than dropping Exelon as a defendant (compare SAC ¶¶ 17-18, 24 with FAC ¶¶ 17-18, 24 and Complaint ¶¶ 19-20, 26).  Instead the SAC alleged that the Network Products infringed the claims of Patent '734 in the manner shown in a chart attached as its Exhibit B (SAC ¶ 24), while silently excising the example of an hourly repetition from its allegation that the communication cycles repeat (compare SAC ¶ 16 with Complaint ¶ 18 and FAC ¶ 16).

Exhibit B was organized into three columns to facilitate comparison of the language of Claim 1, a tentative claim construction and a description of how the Network Products allegedly practiced each element of Claim 1 on the basis of that proffered construction.  It argued that the Smart Meters practice the Power Element by the bare fact that they use half-duplex communications, powering down their transceivers' receiver circuitry while transmitting (SAC Ex. B at elem. 6).  To explain the role that "cycle establishing information transmitted from the hub" played in that manner of battery conservation -- a requirement of the Power Element (col. 45 ll. 38-40) -- Exhibit B alleged that the Access Point communicates the start time of each communication cycle by transmitting a request for a meter reading or to check the Smart Meter's status, with that request alerting the Smart Meter that the cycle is starting (SAC Ex. B at

elem. 3). And because both the requests and the responses to those requests are fixed in length, transmission of the request alone assertedly suffices to inform the Smart Meter of the duration of the intervals respectively allocated to the Access Point for transmission and to the Smart Meter (SAC Ex. B at elem. 4).

For a third time ComEd moved to dismiss Atlas' operative pleading, noting that Exhibit B instead showed that the Network Products could not possibly infringe Patent '734. On Atlas' own telling, it argued, the Access Point's bare initiation of communications with one Smart Meter would not allocate transmission opportunities to each of the other Smart Meters in the neighborhood area network as required by the Frame Element. Moreover, Atlas had simply alleged that each Smart Meter would cut power to its receiver only when transmitting, but the Power Element required that each do so whenever another Smart Meter was transmitting to the Access Point.

That motion at last prompted a defense on Atlas' part (the "Dismissal Memorandum"). There for the first time Atlas explained its contention that the Frame Element did not require the transmission of two separate pieces of information in order to allocate transmission opportunities (1) between the hub and the remotes as a group and (2) among each of the individual remotes "[w]hen there is only one additional communicator [beside the hub], such as with the accused instrumentalities" (Dis. Mem. 5). In that configuration, Atlas argued, supplying the first piece of information necessarily and adequately supplies the second (id. at 2-5). Atlas similarly contended that when a lonesome Smart Meter turns off its receiver while transmitting, its receiver is off at all times other than when it can expect a transmission from the Access Point and thus practices the Power Element (id. at 5-6).

This Court granted ComEd's motion to dismiss on May 17 and denied leave to amend (Dkt. No. 34).  In the course of the May 17 Opinion this Court noted that even on the basis of the Dismissal Memorandum's defense of Exhibit B's allegations, there would be no infringement where multiple Smart Meters were part of the same neighborhood area network, which this opinion follows Atlas in calling it a "multi-remote system."

Consequently Atlas' claim for relief rested on three untenable propositions.  First, where Claim 1 plainly disclosed an MAC protocol that could govern both single-remote and multi-remote systems (a "flexible-network protocol"), the Dismissal Memorandum required that Claim 1 cover an MAC protocol that was wholly incapable of coordinating communications among a hub and more than one remote (a "paired-communicator protocol").  Second, even if Atlas' paired-communicator protocol theory were accepted, the SAC had failed to allege that the communication cycles repeated <u>continuously</u> without significant gaps, as required by the Repeating Cycle Element.  Lastly, the Dismissal Memorandum's representation that the Network Products were always placed in single-remote systems contradicted the SAC.

ComEd filed this motion for attorney's fees on May 31 (Dkt. No. 39).  Atlas then appealed the judgment against it (Dkt. No. 42).  That appeal is still pending.

### **Exceptionality of the Case**

This Court was troubled by Atlas' Dismissal Memorandum, which gave the impression of someone trying to bang a square peg into a round hole.  But it is also troubled by ComEd's memorandum in support of its present motion for fees, which likewise seems to throw every argument counsel could think of against the wall and see what sticks.  This opinion will consequently consider only those arguments that ComEd makes expressly, treating others as

having been forfeited. And for the same reason this opinion will explain the deficiency of those arguments in more detail than they might otherwise warrant.

**<u>Atlas' Conduct During This Litigation</u>**

ComEd rattles off in ten bullet points examples of what it alleges to be Atlas' unreasonable litigation conduct (C. Mem. 10-11). Those are presented as distinct from what made Atlas' case unusually weak as a substantive matter. But in the main ComEd recounts a tale in which every ordinary attempt to gain an allowed advantage in an adversary contest -- successes and missteps alike -- forms a tile in a mosaic depicting extraordinarily unreasonable lawyering. That will not do.

Restatement is often enough to show how ill-conceived most of ComEd's accusations are. Thus ComEd blames Atlas for suing over infringement that allegedly occurred while Patent '734 was valid and before the limitations period had run -- but after the patent itself had expired (C. Mem. 10). It accuses Atlas of filing a Complaint that contained more information than the Rules required on the day it was filed, but that would ultimately prove to be insufficient with the abrogation of Form 18 (<u>id.</u>). It wants Atlas pilloried for filing two suits in separate jurisdictions to obtain relief from distinct defendants, subject to the personal jurisdiction of different courts, for conduct arising from separate (but similar) transactions or occurrences (<u>id.</u>). ComEd seeks to recover its own legal fees for the entire action because Exelon -- which was dismissed early in the case precisely because it is an entity distinct from ComEd -- might once have been able to seek sanctions to recoup what it expended before that early dismissal (<u>id.</u>).

As a further alleged example of Atlas' unreasonable conduct during this litigation, ComEd points to the fact that it sued on Claim 1 with no means of distinguishing it from the Invalidated Claims (C. Mem. 10). And it points to Durie's letter to fault Atlas for not having

dropped this action after having been told that its allegations were meritless (id.). But this Court made no finding of invalidity, and ComEd has not presented any reason (as opposed to insinuations) to conclude that Claim 1 would ultimately have been invalidated, let alone that the battle would have been so one-sided that Atlas should never have joined it. Lacking a record due to this action's timely dismissal, this Court also cannot conclude that Atlas' case was factually deficient in what should have been a readily ascertainable manner. And Atlas' refusal to accept that it had no case based solely on opposing counsel's out-of-court representations is not unusually unreasonable, if it is unreasonable at all.

ComEd's attempts to lock Atlas into a litigation position on the basis of Summerfield's e-mail appear to exceed the bounds of expected attorney argumentation and, indeed, may border on outright misrepresentation. Summerfield had responded to Durie's letter with the argument that the Frame Element distinguished Claim 1 from the Invalidated Claims. In the Dismissal Memorandum, by supposed contrast, he argued that in single-remote systems the information described in the second half of the Frame Element would be redundant with that described in the first half. But ComEd tendentiously summarizes those arguments as first insisting on the importance of the Frame Element and then asserting that the element itself was entirely redundant (C. Mem. 4-5, 10). Similarly, ComEd attempts to transmute Summerfield's reference to "other devices" in describing the content of the IEEE 802.15.4g protocol and his quotation of the Frame Element, which contains the phrase "each remote," into a definite and fully articulated statement that he somehow contradicted in arguing that the Network Products utilize a paired-communicator protocol (C. Mem. 4, 11).

And even if Summerfield altered his theory of the case in the manner it suggests, ComEd advances nothing resembling an estoppel argument. But litigants do not somehow get

irrevocably committed to positions where no species of estoppel is available merely because the standards governing Sections 285 and 1927, being discretionary, are amorphously phrased in terms of "unreasonable" conduct.

ComEd similarly seeks to expand the scope of the duties the Rules lay on counsel by indicting Summerfield's failure to respond to Durie's follow-up e-mail (C. Mem. 11). But under Rule 33(a)(1) ComEd is entitled to pose only 25 interrogatories before it must seek leave of the Court for more, and so it is not unreasonable for Summerfield to have ceased providing freebies or to have left off arguing his client's case by e-mail when there is zero chance of persuading his interlocutor.

In only two respects does ComEd point to conduct that might stand out in terms of unreasonableness. Atlas filed the FAC knowing the arguments ComEd would make for its dismissal -- ComEd had already lodged them against the Complaint -- but without any intention of meeting those arguments, instead withdrawing its FAC and then addressing in the SAC the concerns that ComEd had raised about the Complaint (C. Mem. 11). Even then Atlas did not proffer its paired-communicator protocol theory in the SAC, instead raising it for the first time in arguing why Exhibit B's account of how the Network Products allegedly infringed Claim 1 did not in fact plead it out of court (id.).

This Court sees no explanation for that conduct other than that Atlas filed this action without adequate investigation. As for the late appearance of the paired-communicator protocol theory in particular, it seems clear that Atlas was extemporizing in response to a weakness that ComEd had identified in its still green theory of the case, rather than presenting arguments it had considered in the lead-up to litigation. And Atlas continues to do so now, floating an attempted explanation for how the Network Products might practice the Repeating Cycle Element for the

first time in its memorandum opposing <u>the current</u> motion (A. Mem. 9-11) after that lacuna was pointed out to it in the May 17 Opinion. And filing suit with such a poorly thought-out conception of how the accused products might actually infringe is certainly an unreasonable course of action, worthy of invoking Section 285 to lay the costs of this action at Atlas' doorstep.

**<u>Relative Weakness of Atlas' Case</u>**

ComEd points to no way in which Atlas' case was unusually weak that was not discussed in the May 17 Opinion (see C. Mem. 10). Of course that opinion was limited to what was alleged in the SAC, with all reasonable inferences drawn in Atlas' favor.

Even conceding those advantages to Atlas, however, the implausibility of the claim construction on which its case hinged was readily apparent. But this is not to conclude that its claim construction was frivolous, and ComEd does not list the Dismissal Memorandum's having offered it as grounds for sanctioning Atlas' attorneys under Section 1927. So this Court will not weigh it against that standard.

But unquestionably it was a tough row to hoe (at a minimum) for Atlas to argue that an MAC protocol designed to prevent destructive interference among numerous remotes -- the sort of function performed by routers without regard for the content of the communications -- would cover all half-duplex communication any time two parties exchanged digital messages of predictable length. Atlas was not aided by the fact that Claim 1 was phrased in terms of multiple remotes. And even putting that problem aside, the paired-communicator protocol theory could not be squared with the factual allegations to which Atlas had already committed itself. That last difficulty is probably explained by the fact that Atlas appears to have filed this lawsuit thinking that the presence of communication modules built to the IEEE 802.15.4g standard was itself sufficient to signal an infringing product -- a position that it has not advanced in this action, in all

likelihood with good reason. But regardless of whether this action was filed with a different theory of infringement in mind or with no theory in mind at all, the wobbliness of its ultimate theory was severe enough to justify making Atlas liable for the expense of defending against it.

As a riposte Atlas faults ComEd for seeking an award of attorneys' fees on the basis of the paired-communicator protocol theory's substantive weakness, when ComEd itself pointed to the flaws in that theory only in a reply memorandum filed on its third motion to dismiss (A. Mem. 5-6, 13). But that is wholly understandable (and entirely reasonable), for of course Atlas did not raise that theory in any discernable form until its own response to that motion, and the theory is so contrary to the tenor of Patent '734 that even if it were a defensible construction (as it is not) ComEd could hardly be blamed for not having divined whatever role it allegedly had in shaping any of Atlas' three complaints.

On that score Atlas now insists that its allegations had always covered both single-remote and multi-remote systems (A. Mem. 4-5, 15). But that retort involves a flat misrepresentation of the May 17 Opinion's argument, and thus Atlas' ability to point to its pleadings' use of the phrases "at least one device," "a smart meter" and "the smart meter" does not stand against this opinion's conclusion that Atlas improvised the paired-communicator protocol theory for the Dismissal Memorandum.

For while a flexible-network protocol can facilitate communications in both single-remote and multi-remote systems, a paired-communicator protocol is incapable of handling multi-remote systems, and what was at issue at the time was whether Claim 1 could cover a paired-communicator protocol in addition to the flexible-network protocols toward which it was obviously directed -- not whether Claim 1 could cover an MAC protocol that happened to be utilized by a single-remote system. In that regard the fact that the language of "at

least one device" in Complaint ¶ 13, FAC ¶ 11 and SAC ¶ 11 encompasses situations in which there is just one device is entirely irrelevant, for that phrase unquestionably connotes "sometimes more than one," while the Dismissal Memorandum's theory of infringement required a statement to the effect of "never more than one."

As to Atlas' emphasis on its use of singular indefinite and definite articles when referring to Smart Meters in its pleadings, Baldwin Graphic Sys., Inc. v. Siebert, Inc., 512 F.3d 1338, 1343 (Fed. Cir. 2008) stated a general rule of English usage rather than just a technical maxim of claim construction when it said:

> [T]he use of a definite article ("said" or "the") to refer back to an initial indefinite articles does not implicate, let alone mandate the singular. Because the initial definite article ("a") carries either a singular or plural meaning, any later reference to that same claim element merely reflects the same potential plurality.

And so again Atlas engages in revisionist history in urging that its allegations that antedated the Dismissal Memorandum ever suggested that the Network Products were necessarily arranged in a manner that would satisfy its paired-communicator protocol theory.

### Unreasonable and Vexatious Multiplication of Proceedings

ComEd further seeks to hold Stadheim & Grear jointly and severally liable for its legal fees: Summerfield's firm, rather than Summerfield himself, is the target identified in both ComEd's motion (Dkt. No. 39 at 1) and its memorandum (C. Mem. 13-14; see also C. Reply 2). But it does not matter that Claiborne, 414 F.3d at 723 teaches that only Summerfield himself could be sanctioned under Section 1927,[3] for ComEd does not persuasively make the case that anyone should be sanctioned under that statute for the conduct it impugns.

---

[3] Two other attorneys entered appearances on Atlas' behalf, but one of those seems to have done nothing other than file an appearance, while the other exceeded that level of

(continued)

- 15 -

ComEd identifies five reasons that might, it avers, support an award of sanctions under Section 1927. In part it contends that this action should not have been filed at all, it blames Summerfield for filing it the day before Form 18 was abrogated, and it asserts that he should not have advised Atlas to continue its suit in the face of St. Jude Med. and Durie's letter (C. Mem. 13). It further points to Summerfield's having failed to include the paired-communicator protocol theory in any of the pleadings he filed on Atlas' behalf, instead raising it for the first time in response to ComEd's third motion to dismiss (id.). Finally, C. Mem. 13 argues:

> [A] fee award under Section 1927 is particularly appropriate because Atlas may be judgment-proof, as it appears to be a non-practicing entity and the extent of its non-patent assets is not currently known. Holding Stadheim & Grear jointly and severally liable would ensure that ComEd is compensated for its losses.

All that ComEd offers to support sanctioning Summerfield for bringing this case in the first place, however, is a quotation from the May 17 Opinion characterizing the case as a whole, which is not an argument for placing the blame on him rather than or in addition to his client. This opinion has already disposed of ComEd's contentions that it was unusually "unreasonable" within the meaning of Octane Fitness, 134 S. Ct. at 1756 (1) to file a complaint that exceeded what the Rules then required and (2) to persist in the face of Durie's letter, so a fortiori those actions do not qualify for the higher standard of sanctionable misconduct. And having a judgment-proof client is not a ground for sanctions.

So the only colorable ground for sanctioning Summerfield that ComEd articulates would be the fact that he offered the paired-communicator protocol theory late in the game. But just as

---

(footnote continued)
participation only in having his name listed second on Atlas' response to this motion. Accordingly they will be ignored here.

there is no need to "anticipate or attempt to defuse potential defenses" as to possible affirmative defenses (see U.S. Gypsum Co. v. Ind. Gas Co., 350 F.3d 623, 626 (7th Cir. 2003)), there is no obligation to anticipate ordinary defenses to liability after having stated a claim. While the SAC was certainly flawed, ComEd does not assert that it was so lacking in detail as to be sanctionably flawed. Nor does it argue that the Dismissal Memorandum was itself sanctionable for offering the paired-communicator protocol theory, let alone why offering a supposedly sanctionable argument 19 days before judgment was entered in this action should trigger liability for the costs of the entire action. Consequently, ComEd's memorandum does not state reasons sufficient for imposing sanctions on Summerfield under Section 1927.

**Conclusion**

ComEd's motion for attorneys' fees and costs under 35 U.S.C. § 285 (Dkt. No. 39) is granted, but its contemporaneous request to hold Stadheim & Grear jointly and severally liable under 28 U.S.C. § 1927 is denied. Complicating matters, however, ComEd has failed to include along with its motion both (1) a statement of the amount sought from Atlas in attorneys' fees (or a fair estimate of it) as required by Rule 54(d)(2)(B)(iii) and (2) a joint statement as to whether any other matters remain in dispute and, if so, an identification of those disputes -- see this District Court's LR 54.3(e) and (f). Consequently a status hearing is ordered to be held at 8:45 a.m. July 29, 2016.

_____
Milton I. Shadur
Senior United States District Judge

Date: July 22, 2016